**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Julie Roubideaux, and Shelly Grossman, | ) | **ORDER GRANTING DEFENDANTS'** |
| | ) | **MOTION FOR SUMMARY** |
| Plaintiffs, | ) | **JUDGMENT** |
| | ) | |
| vs. | ) | |
| | ) | |
| North Dakota Department of Corrections | ) | |
| and Rehabilitation, Elaine Little, Timothy | ) | |
| Schuetzle, Don Redmann, Southwest | ) | |
| Multi-County Correctional Center, and | ) | |
| Leann Bertsch, | ) | Case No.  1:04-cv-013 |
| | ) | |
| Defendants. | ) | |

Before the Court is the Defendants' Motion for Summary Judgment filed by Defendants North Dakota Department of Corrections and Rehabilitation, Elaine Little, Timothy Schuetzle, Don Redmann, and Leann Bertsch (collectively "State Defendants") on October 13, 2005.  Defendant Southwest Multi-County Correction Center joined the State Defendants' Motion for Summary Judgment on December 4, 2006.  The Plaintiffs filed a response opposing the motion on June 16, 2007.  The State Defendants and the Southwest Multi-County Correction Center filed replies on June 29, 2007, and July 3, 2007, respectively.  The Plaintiffs requested an opportunity for additional briefing, which the Court granted, and on July 31, 2007, the Plaintiffs filed a surreply brief.  The State Defendants and the Southwest Multi-County Correction Center both filed their final briefs on August 27, 2007.  For the reasons set forth below, the Defendants' motion is granted.

## I.      BACKGROUND OF THE CASE

### A.      THE PLAINTIFFS' CLAIMS

The Plaintiff class[1] ("female inmates"), former and present female inmates of the North Dakota Department of Corrections and Rehabilitation, filed suit alleging that the Department of Corrections and Rehabilitation has "violated the rights of female inmates under the equal protection clauses of the United States and North Dakota constitutions and Title IX of the federal Educational Amendments Act of 1972 by discrimination on the basis of sex." See Complaint, ¶ 19 (Docket No. 1).  The female inmates contend that the "Defendants have provided female inmates, in comparison with their male counterparts, with unequal and inferior housing, facilities, classification systems, orientation programs, educational programs, vocational programs, work opportunities, and substance abuse treatment opportunities." See Complaint, ¶ 19 (Docket No. 1).  The female inmates' complaint encompasses a period beginning in November 1997 to the present.  The relief requested by the female inmates is primarily injunctive and declaratory.[2] See Order Adopting Report and

---

[1] On September 8, 2005, the Court certified the following class under Rule 23(b)(2):

> All women incarcerated by the Prisons Division of the North Dakota Department of Corrections and Rehabilitation (DOCR) at any time since November 6, 1997.

See Docket No. 84.

[2] In their brief in support of the motion for class certification, the female inmates stated the following:

> [T]he monetary damages that plaintiffs seek incidental to the central injunctive and declaratory relief sought does not in any way deflect the thrust of this lawsuit away from the constitutional questions which will ultimately determine if there is any reason to hear individual claims.
>       . . .
> [T]he principal relief sought is declaratory and injunctive relief that finds the defendants' policies, procedures, and practices violate the law and order changes in those policies, procedures, and practices.  As shown above, any compensatory damages obtained would be incidental to this central declaratory and injunctive relief.

See Docket No. 40, pp. 31-32.

Recommendation (Docket No. 84).  Any request for monetary damages is incidental.  See Order

Adopting Report and Recommendation (Docket No. 84).


### B.      OVERVIEW OF THE FACILITIES

At the outset, the Court notes that the task of summarizing the facilities at which male and

female inmates have been housed in North Dakota, and the programs that have been available to

male and female inmates since November 1997, has been difficult due to the ever-changing prison

populations and program offerings.  Nevertheless, the Court has carefully reviewed the voluminous

documents provided by the parties and finds the following facts are undisputed.

Since November of 1997, female inmates have been housed in four separate facilities – the

North Dakota State Penitentiary, the Missouri River Correctional Center, the James River

Correctional Center, and the Dakota Women's Correction and Rehabilitation Center.[3]  See Affidavit

of Timothy Schuetzle (Docket No. 90).  Prior to June 1998, female inmates were housed with male

inmates at either the North Dakota State Penitentiary or the Missouri River Correctional Center.  See

Affidavit of Timothy Schuetzle, ¶ 4 (Docket No. 90).  In June 1998, the female inmates at the North

Dakota State Penitentiary were transferred to the James River Correctional Center.  See Affidavit

of Timothy Schuetzle, ¶ 5 (Docket No. 90).  Since 2003, the Department of Corrections and

Rehabilitation has contracted with the Southwest Multi-County Correction Center in Dickinson,

North Dakota, to house, provide services, and conduct programming for female inmates at the

Dakota Women's Correction and Rehabilitation Center.  In November 2003, all of the minimum

---

[3] Female inmates are also housed at the Tompkins Rehabilitation Center in Jamestown, North Dakota, and in transitional living centers in Fargo and Bismarck, North Dakota.  However, the Plaintiffs do not allege that any discriminatory actions took place at these facilities.

custody female inmates were transferred to the Dakota Women's Correction and Rehabilitation Center.  See Affidavit of Timothy Scheutzle, ¶ 6 (Docket No. 90).  In August of 2004, the medium custody female inmates at the James River Correctional Center were transferred to the Dakota Women's Correction and Rehabilitation Center.

Male inmates are housed at the North Dakota State Penitentiary, the James River Correctional Center, the Tompkins Rehabilitation and Corrections Center, a transitional living center in Bismarck, North Dakota, and out-of-state correctional facilities or in-state county jails.  See Affidavit of Timothly Schuetzle, ¶ 3 (Docket No. 90).

Over the past seven years, the male to female population has averaged around a 10:1 ratio. See Affidavit of Timothly Schuetzle, ¶ 3 (Docket No. 90).  In 2004, the average sentence of male inmates was 41.8 months.  See Affidavit of Timothy Schuetzle, ¶ 14 (Docket No. 90).  For the same period, the average sentence of female inmates was 33.1 months.  See Affidavit of Timothy Schuetzle, ¶ 14 (Docket No. 90).  Between January 2003 and February 2004, female inmates received an average of 206 parole days, and male inmates received an average of 184 parole days. See Affidavit of Timothy Schuetzle, ¶ 15 (Docket No. 90).

## 1.     THE NORTH DAKOTA STATE PENITENTIARY

### a.     POPULATION & PHYSICAL DESCRIPTION

The North Dakota State Penitentiary was the original prison for the state of North Dakota, with its first building being constructed in 1910.  The North Dakota State Penitentiary is located in Bismarck, North Dakota, the capitol of North Dakota and a metropolitan area with a population of approximately 70,000.  See Affidavit of Timothy Schuetzle, ¶ 10 (Docket No. 90).  The North

Dakota State Penitentiary is a multi-story, rambling facility.  <u>See</u> Affidavit of Timothy Schuetzle, ¶ 3 (Docket No. 90).  As of October 1, 2005, the population of the North Dakota State Penitentiary was 438 male inmates, excluding 54 unclassified orientation inmates.  <u>See</u> Affidavit of Timolthy Schuetzle, ¶ 10 (Docket No. 90).  Thirty-four inmates were classified as minimum custody and the remainder were classified as medium and maximum custody.  <u>See</u> Affidavit of Timothy Schuetzle, ¶ 10 (Docket No. 90).  The cost to house an inmate at the North Dakota State Penitentiary during the 2005-2007 biennium was expected to average $72 per day.  <u>See</u> Affidavit of Timothy Schuetzle, ¶ 8 (Docket No. 90).  The North Dakota State Penitentiary has approximately 550 beds.  <u>See</u> Deposition of Elaine Little, pp. 99-100 (Docket No. 177, Disc 1).

### b.    <u>EDUCATION</u>

There are a variety of educational programs for inmates at the North Dakota State Penitentiary, including GED classes, computer classes, a non-credit accounting course taught by a North Dakota State Penitentiary teacher, and work-force training classes.  <u>See</u> Affidavit of Timothy Schuetzle, ¶¶ 20- 22, 26 (Docket No. 90).  The North Dakota State Penitentiary offers independent college study correspondence classes and one on-site course for college credit.  <u>See</u> Deposition of Dan Wrolstad, pp. 39-40 (Docket No. 177, Disc 1).   A course in accounting is usually offered at least once a year.  <u>See</u> Deposition of Dan Wrolstad, p. 56 (Docket No. 177, Disc 1).   For a period of time, a restaurant management class was offered to inmates in the treatment unit, but it has been replaced with a heating and air conditioning program.  <u>See</u> Deposition of Timothy Scheultze, p. 245 (Docket No. 177, Disc 1); Deposition of Dan Wrolstad, pp. 48-49 (Docket No. 177, Disc 1).  A computer skills training course taught by inmates has been offered, but it was discontinued in 2005.

See Deposition of Dan Wrolstad, p. 38-39 (Docket No. 177, Disc 1).  In the past, the North Dakota State Penitentiary has offered on-site classes in speech and pre-algebra.  See Deposition of Dan Wrolstad, p. 51-52 (Docket No. 177, Disc 1).

### c.   EMPLOYMENT OPPORTUNITTIES

Inmates placed at the North Dakota State Penitentiary have a number of industry jobs available through Rough Rider Industries, an independent state agency, which includes a sign shop, furniture shop, upholstery shop, metal factory, and license plate factory.  See Deposition of Elaine Little, pp. 40, 88 (Docket No. 177, Disc 1); Deposition of Dennis Fracassi, p. 31 (Docket No. 177, Disc 1).  The Rough Rider furniture factory produces office furniture, nursing home furniture, and case goods (i.e., desks, credenzas, bookcases, hutches).  See Deposition of Dennis Fracassi, p. 45 (Docket No. 177, Disc1).  The sign shop receives about 95 percent of its business from the Department of Transportation and makes traffic road signs and highway delineators.  See Deposition of Dennis Fracassi, p. 47 (Docket No. 177, Disc 1).  The metal shop supplies garbage dumpsters, park furniture, and does power painting and light welding for other manufacturers.  See Deposition of Dennis Fracassi, p. 50 (Docket No. 177, Disc 1).  However, when women were housed at the North Dakota State Penitentiary, only the upholstery shop was open to female inmates.  See Deposition of Elaine Little, p. 42 (Docket No. 177, Disc 1).  Inmates were also assigned to prison jobs, such a janitorial, kitchen, laundry, and groundskeeping.  See Deposition of Elaine Little, p. 92 (Docket No. 177, Disc 1).

####     d.      TREATMENT

The North Dakota State Penitentiary offers mental health treatment, substance abuse treatment programs (Level 2.1 and 3.5), sex offender treatment, anger management treatment, and psychological/psychiatric services.  See Deposition of Michael Froemke, pp. 23-24, 42, 48, 56 (Docket No. 177, Disc 1).

####     2.      THE MISSOURI RIVER CORRECTIONAL CENTER

####     a.      POPULATION & PHYSICAL DESCRIPTION

The Missouri River Correctional Center (also referred to as "the farm") is a two-story minimum custody facility with 150 beds located in Bismarck, North Dakota.  See Affidavit of Timothy Schuetzle, ¶ 12 (Docket No. 90); Deposition of Elaine Little, pp. 99-100 (Docket No. 177, Disc 1).  All male inmates at the Missouri River Correctional Center are classified as minimum custody.  See Affidavit of Timothy Schuetzle, ¶ 12 (Docket No. 90). Both the James River Correctional Center and the North Dakota State Penitentiary send minimum security inmates to the Missouri River Correctional Center.  See Affidavit of Timothy Schuetzle, ¶ 12 (Docket No. 90). The Missouri River Correctional Center relies on the North Dakota State Penitentiary's resources for many of its services, including medical, treatment, industries, orientation, record keeping, staff training, correctional officer scheduling, and disciplinary detention.  See Affidavit of Timothy Schuetzle, ¶ 12 (Docket No. 90).  The cost to house an inmate at the Missouri River Correctional Center during the 2005-2007 biennium was expected to average $47 per day.  See Affidavit of Timothy Schuetzle, ¶ 8 (Docket No. 90).

## b.    EDUCATION

As of October 2005, the Missouri River Correctional Center offered a number of services to its inmates, including GED classes, computer classes, college classes at local colleges at an inmate's own expense (education release), and an auto technician program.  See Affidavit of Timothy Schuetzle,  ¶¶ 20-24 (Docket No. 90).  The vocational training courses varied during the period in question, but at some point courses in automotive mechanics, welding, and carpentry were offered.  See Deposition of Timothy Schuetzle, p. 245 (Docket No. 177, Disc 1).  Prior to release, inmates also complete a two-week pre-release program consisting of job seeking skills, resume writing, interest inventory, math skills, money management, and workplace safety(work-force training).  See Deposition of Dan Wrolstad, p. 34 (Docket No. 177, Disc 1).

During the time that both men and women were housed at the Missouri River Correctional Center, male inmates had access to a large walking track, ballfield and basketball court.  See Deposition of Timothy Schuetzle, p. 244 (Docket No. 177, Disc 1).  The female inmates had access to a smaller separate outdoor recreation area with a basketball hoop and walking area.  See Deposition of Timothy Schuetzle, p. 244 (Docket No. 177, Disc 1).  Female inmates had access to the large walking track and ballfield at times when the male inmates were not allowed access to these areas.  See Deposition of Timothy Schuetzle, p. 244 (Docket No. 177, Disc 1).  On occasion there would be "coed recreation" where both male and female inmates would have access to the larger outdoor facilities.  See Deposition of Timothy Schuetzle, p. 244 (Docket No. 177, Disc 1).

c.      **EMPLOYMENT OPPORTUNITTIES**

At the Missouri River Correctional Center, Rough Rider Industries operates a welding program and a small farming/livestock operation.  See Deposition of Dennis Fracassi, p. 44 (Docket No. 177, Disc 1).  In the welding program, the inmates produce cattle panels and feeders.  See Deposition of Dennis Fracassi, p. 51 (Docket No. 177, Disc 1).

d.      **TREATMENT**

The Missouri River Correctional Center offers mental health treatment, substance abuse treatment programs (Level 2.1), and psychological/psychiatric services.  See Deposition of Michael Froemke, pp. 23-24, 42, 48 (Docket No. 177, Disc 1).

3.      **THE JAMES RIVER CORRECTIONAL CENTER**

a.      **POPULATION & PHYSICAL DESCRIPTION**

The James River Correctional Center is a six-story facility that opened in 1998 in Jamestown, North Dakota.  See Affidavit of Timothy Schuetzle, ¶ 3 (Docket No. 90).  Jamestown, North Dakota, has a population of 16,000, and the James River Correctional Center's facilities are located on the North Dakota State Hospital grounds.  See Affidavit of Timothy Schuetzle, ¶ 11 (Docket No. 90).  As of October 1, 2005, the James River Correctional Center housed 374 male inmates, of which 42 were minimum custody inmates; the remainder of inmates at James River Correctional Center were medium custody.  The cost to house an inmate at the James River Correctional Center during the 2005-2007 biennium was expected to average $72 per day.  See Affidavit of Timothy Schuetzle, ¶

8 (Docket No. 90).  The James River Correctional Center has approximately 400 beds.  See Deposition of Elaine Little, pp. 99-100 (Docket No. 177, Disc 1).

The James River Correctional Center has a recreation yard, which includes a walking track, a horseshoe pit, a volleyball pit, and a handball court.  See Deposition of Donald Redmann, p. 109 (Docket No. 177, Disc 1).  There is also a gymnasium, of which the lower level held the library, law library, and in 2002-2003, the commissary.  See Deposition of Donald Redmann, p. 109 (Docket No. 177, Disc 1).  Each housing unit is designed for 80 beds with a dorm setting and each housing unit has a day room where the inmates have access to a telephone, a table, a television, and an officer station.  See Deposition of Donald Redmann, p. 109-110 (Docket No. 177, Disc 1).  Meals are served in the units.  Inmates go through a serving line and eat at the tables in the day room.  See Deposition of Donald Redmann, p. 109 (Docket No. 177, Disc 1).  The second floor of the building was used as the primary incarceration unit for all female inmates.  The sixth floor of the building, which contained some specialty disciplinary detention cells, was also used at times as overflow housing for female inmates.  See Deposition of Donald Redman, pp. 98-99 (Docket No. 177, Disc 1).

**b.    EDUCATION**

The James River Correctional Center offers GED programs, work-force training classes, computer classes, and correspondence classes that can be taken at an inmate's expense.  See Affidavit of Timothy Schuetzle, ¶¶ 20- 22 (Docket No. 89).

During 2000-2001, the James River Correctional Center offered one vocational program, a food service program that provided hands-on and classroom experience in food service.  See

10

Deposition of Donald Redmann, pp. 187-190 (Docket No. 177, Disc 1).  Other than the food-service program, no other vocational programs have been offered at the James River Correctional Center. See Deposition of Donald Redman, pp. 187-190 (Docket No. 177, Disc 1).

### c.    EMPLOYMENT OPPORTUNITIES

Inmates at the James River Correctional Center also have access to prison-industry jobs, primarily through Rough Rider Industries.  See Deposition of Elaine Little, p. 93 (Docket No. 177, Disc 1).  The James River Correctional Center offers "cut and sew" as its only industry program, where inmates work on a variety of sewing contracts.  See Deposition of Elaine Little, pp. 93, 130 (Docket No. 177, Disc 1).  This program was available to female inmates when they were housed at the James River Correctional Center.  See Deposition of Elaine Little, pp. 93, 130 (Docket No. 177, Disc 1).  The inmates make upholstery products, chairs, sports training apparatus, and military clothing.  See Deposition of Dennis Fracassi, p. 53 (Docket No. 177, Disc 1).

### d.    TREATMENT

The James River Correctional Center offers mental health treatment, substance abuse treatment program (Level 2.1), sex offender treatment, anger management treatment, and psychological/psychiatric services.  See Deposition of Michael Froemke, pp. 23-24, 48 (Docket No. 177, Disc 1).

4.      **THE DAKOTA WOMEN'S CORRECTION AND REHABILITATION CENTER**

   a.      **POPULATION & PHYSICAL DESCRIPTION**

Beginning in 2003, the Department of Corrections and Rehabilitation contracted with the Southwest Multi-County Correction Center[4] to house female inmates at the Dakota Women's Correction and Rehabilitation Center.  See  Docket No. 177, Disc 2, Exhibit 204.  The Dakota Women's Correction and Rehabilitation Center is an all-female facility which houses approximately 110 female  inmates[5] and is located in New England, North Dakota, a rural community with a population of 527.  See Affidavit of Timothy Schuetzle, ¶ 9 (Docket No. 90).  The Dakota Women's Correction and Rehabilitation Center is a former Catholic boarding school.  See Affidavit of Timothy Schuetzle, ¶ 13 (Docket No. 90).  It was purchased by the Southwest Multi-County Correction Center prior to 2000 for the purpose of converting it into a facility for juveniles.  See Deposition of Norbert Sickler, pp. 41-45 (Docket No. 177, Disc 1).  However, when the anticipated increase in demand for placements at the Dakota Horizon Youth Center did not materialize, the Southwest Multi-County Correction Center began to pursue plans to renovate the boarding school into a facility to house female inmates.  See Deposition of Norbert Sickler, pp. 46-49 (Docket No. 177, Disc 1).  All of the inmates housed at the Dakota Women's Correction and Rehabilitation Center since it opened have been those designated in the contract between the Department of Corrections and Rehabilitation and the Southwest Multi-County Correction Center. See Affidavit

---

[4]The Southwest Multi-County Correction Center is a regional corrections center which operates two other facilities:  (1) the Dakota Horizon Youth Center and (2) the Dakota Women's Correction and Rehabilitation Center.

[5]The Dakota Women's Correction and Rehabilitation Center has 109 general population beds, 16 orientation beds, three infirmary beds, and five beds in the Special Management Unit ("SMU"), for a total of 133 beds.  See Deposition of Jo Rooks, p. 86 (Docket No. 177, Disc 1).

of Leann Bertsch, ¶ 3 (Docket No. 178-3).  In other words, the Dakota Women's Correction and Rehabilitation Center has housed only female inmates who have been sentenced to a period of imprisonment in the custody of the Department of Corrections and Rehabilitation.

As of October 2005, excluding orientation inmates who were not classified, two-thirds of the female inmates were minimum custody and the remainder were medium custody.  See Affidavit of Timothy Schuetzle, ¶ 9 (Docket No. 90).  The Dakota Women's Correction and Rehabilitation Center has two dorms – Haven Hall, which is the minimum custody unit, and Horizon Hall, which is the medium and above custody unit.  See Deposition of Heather Luchi, pp. 50-54 (Docket No. 177, Disc 1).  Hazen Hall consists of nine dorms, each with five to ten beds, and Horizon Hall has four dorms each of those dorms with approximately ten beds.  See Deposition of Heather Luchi, pp. 50-54 (Docket No. 177, Disc 1).  In the summer of 2006, an administrative segregation unit and an orientation unit were opened.  See Deposition of Heather Luchi, pp. 50-54 (Docket No. 177, Disc 1).

Minimum custody inmates have no perimeter fence and live-in dormitory style housing from which they "check out" when they are leaving to go to the main building for meals, programming, recreation, and other services.  See Affidavit of Timothy Schuetzle, ¶ 9 (Docket No. 90).  The Dakota Women's Correction and Rehabilitation Center also offers a variety of options for recreation programming.  There are currently two walking tracks, both housing units have sand volleyball pits, and there are two gymnasiums that have various weightlifting and cardiovascular equipment.  See Deposition of Heather Luchi, pp. 192-197 (Docket No. 179, Disc 1).  The cost to house an inmate at the Dakota Women's Correction and Rehabilitation Center during the 2005-2007 biennium was expected to average $89 per day.  See Affidavit of Timothy Schuetzle, ¶ 8 (Docket No. 90).

**b.** <u>EDUCATION</u>

As of October 2005, inmates housed at the Dakota Women's Correction and Rehabilitation

Center have access to GED classes, computer and keyboarding classes, work-force training classes,

the opportunity to enroll in college classes at local colleges at their own expense, a welding program

open to minimum security inmates, and basic parenting classes.  <u>See</u> Affidavit of Timothy Schuetzle,

¶¶ 20-23, 25, 27 (Docket No. 90); Deposition of Heather Luchi, pp. 109-112, 115, 119-120, 123-

125, 132 (Docket No. 117, Disc 1).  The Dakota Women's Correction and Rehabilitation Center

inmates also have access to social skills, speech, parenting, and healthy lifestyles classes.  <u>See</u>

Deposition of Colby Braun, p. 188 (Docket No. 177, Disc 1).  The Dakota Women's Correction and

Rehabilitation Center offers college classes through the ITV system with Dickinson State University.

<u>See</u> Deposition of Colby Braun, p. 188 (Docket No. 177, Disc 1).

**c.** <u>EMPLOYMENT OPPORTUNITTIES</u>

The Dakota Women's Correction and Rehabilitation Center has an industry program called

Prairie Industries.  <u>See</u> Deposition of Melanie Fitterer, p. 7 (Docket No. 177, Disc 1).  The off-site

component of Prairie Industries contracts with a local company to perform light assembly work.  <u>See</u>

Deposition of Melanie Fitterer, pp. 37-38 (Docket No. 177, Disc 1).  The Prairie Industries program

includes a cut and sew operation and a key-lock program.  <u>See</u> Affidavit of Melanie Fitterer, ¶ 3

(Docket No. 188-6).  Prairie Industries partners with local businesses to contract inmate labor for

the manufacturing of various items including cutting keys, assembling locks, and sewing work

uniforms, hospital gowns, sheets, pillowcases, prison garments, and blankets.  <u>See</u> Deposition of

Melanie Fitterer, pp. 43, 45, 48-51 (Docket No. 177, Disc 1).  In addition to those inmates who make

the various products, Prairie Industries employs inmates in other positions including inventory clerk, shipping inspector, janitor, and tool maintenance.  <u>See</u> Affidavit of Melanie Fitterer, Exhibit A (Docket No. 188-6).

The Dakota Women's Correction and Rehabilitation Center offers the Manpower Services program which is an employment project operated through municipalities or local government entities.  <u>See</u> Deposition of Heather Luchi, p. 19 (Docket No. 177, Disc 1).


### d.   <u>TREATMENT</u>

The Dakota Women's Correction and Rehabilitation Center offers several treatment programs including:  (1) anger management, (2) beyond trauma, (3) house of healing, (4) cognitive restructuring, (5) chemical dependency treatment (Level 2.1), (6) healthy relations, (7) women's mental health, and (8) sex offender treatment.  <u>See</u> Deposition of Rachelle Brewer, pp. 56-57 (Docket No. 177, Disc 1).


### C.   <u>STATUTORY FRAMEWORK</u>

The parties cite to numerous North Dakota statutes which govern the placement of inmates and set forth the standards for correctional facilities.  The Court finds that a brief overview of the North Dakota statutory scheme regarding correctional facilities is warranted.

Chapter 12-47 of the North Dakota Century Code sets forth several of the standards of operation for the North Dakota State Penitentiary.  Section 12-47-38 allows for the placement of female inmates in a county jail, as follows:

> If there is no qualified state facility available, the director of the department of corrections and rehabilitation shall contract with a county for the housing of

female inmates in the county jail, to the extent space is available in the county jail. The county jail must be designed in a manner that can adequately segregate the female inmates from the male inmates.   Any county with which the department contracts must have available and must provide female inmates access to educational and vocational programs, chemical dependency treatment programs, mental health programs, and medical services, and adequate recreational facilities.

Sections 12-47-18 and 12-47-18.1 sets forth the Department of Corrections and Rehabilitation's responsibility for inmates and the ability to transfer inmates between correctional facilities.

The director of the department of corrections and rehabilitation shall be responsible for offenders committed to the legal and physical custody of the department.   The director shall retain, confine, and imprison each offender committed to the department until the expiration of the offender's sentence or until the offender is lawfully entitled to release.   The director shall care for, govern, and make an effort to employ all offenders in conformity with their sentences and in the manner prescribed by law and the rules and regulations lawfully adopted for the conduct of the penitentiary and the department.

N.D.C.C. § 12-47-18.

The director of the department of corrections and rehabilitation may transfer an offender to any facility under the department's control or contract to transfer an offender to another correctional facility for purposes of safety, security, discipline, medical care, or when the director determines it may be in the best interests of the public, the offenders, or the department.

N.D.C.C. § 12-47-18.1.[6]

---

[6]Section 29-27-07 operates in conjunction with Section 12-47-18 and prohibits a state district court judge from designating a specific state correctional facility in which an offender is to be confined:

1.    If a judge of the district court imposes a term of imprisonment to a state correctional facility upon conviction of a felony or a class A misdemeanor, the judge may not designate a state correctional facility in which the offender is to be confined but shall commit the offender to the legal and physical custody of the department of corrections and rehabilitation.

2.    After assuming custody of the convicted person, the department of corrections and rehabilitation may transfer the inmate from one correctional facility to another for the purposes of safety, security, discipline, medical care, or if the department determines it is in the best interest of the public, the inmate, or the department.

Chapter 12-44.1 of the North Dakota Century Code sets forth the statutes applicable to jails and regional correction centers and collectively refers to such entities as "correctional facilities." See N.D.C.C. § 12-44.1-01.  All correctional facilities must be inspected and graded in accordance with Section 12-44.1-06.  Generally, inmates may not be confined to a "grade one" facility for more than one year.  N.D.C.C. § 12-44.1-06(1)(a).  Section 12-44.1-06.2 stated:

> Notwithstanding section 12-44.1-06, a grade one correctional facility that has a contract with the department of corrections and rehabilitation to confine female inmates who have been sentenced to the legal and physical custody of the department of corrections and rehabilitation may confine the female inmate for more than one year in accordance with the terms of the contract.  A female inmate who has been sentenced to the legal and physical custody of the department of corrections and rehabilitation and who is confined in a grade one correctional facility under a contract with the department of corrections and rehabilitation has the same rights to sentence reduction for good and meritorious conduct and to pardon and parole as an inmate confined in a department of corrections and rehabilitation prisons division facility.

Section 12-44.1-06.2 was enacted in 2003 and expired in June 30, 2005.  Section 12-44.01-06.3, enacted in 2005, contained the identical language as Section 12-44.1-06.2 and expired on June 30, 2007.  Section 12-44.1-06(3) was amended in 2007 to incorporate a gender-neutral version of the previous Sections 12-44.1-06.2 and 12-44.1-06.3.  Section 12-44.1-06(3) provides, as follows:

> The department of corrections and rehabilitation, upon the request of the governing body of the correctional facility, may authorize a correctional facility to regularly confine inmates for more than one year if the correctional facility meets criteria established by the department, including:
> a.   A classification system approved by the department.
> b.   Education programs, including vocational education and a general equivalency diploma program.
> c.   Treatment programs, including licensed alcohol or drug addiction counseling.
> d.   Inmate work programs, including prison industries work programs.
> e.   An infirmary and onsite medical and pharmacy services.
> f.   Indoor and outdoor recreation.

Section 12-44.1-08 allows "grade one" correctional facilities to contract for the confinement of offenders in the custody of the Department of Corrections and Rehabilitation and for the confinement of offenders in the custody of the United States. Sections 12-44.1-24 and 12-44.1-25 govern the inspection of correctional facilities.

Chapter 54-23.3 of the North Dakota Century Code establishes the Department of Corrections and Rehabilitation and sets forth the standards by which it must operate. Section 54-23.3-04(11) provides, in part, as follows:

> The director of the department of corrections and rehabilitation has the following powers and duties:
>
> 11.   To contract for correctional services, and to provide such services, with the United States, Canada, other states, and any of their governmental subdivisions and agencies and with another agency or governmental unit in this state, or with any private or public correctional or treatment facility or agency. The director shall reimburse the entity at an amount based upon the services required for the housing and treatment of inmates. The director may also contract to provide services, without cost to the state, for persons held by any of the jurisdictions mentioned in this section. . . .

Section 54-23.3-04(11) was enacted in 1991.


### D.   CLAIMS BEFORE THE COURT

Before examining the pending motion, it is necessary to clarify the claims pending before the Court. As to the Title IX claim, the parties disagree as to whether the Dakota Women's Correction and Rehabilitation Center is a program or activity covered by Title IX.

With respect to the equal protection claim(s) in the motion for summary judgment, the Defendants assert that the female inmates have failed to set forth a prima facie case of an equal protection violation because female inmates are not similarly situated to male inmates. See Docket No. 89. The female inmates respond by contending that summary judgment is inappropriate because

18

Sections 12-47-38 and 12-44.1-06.3 of the North Dakota Century Code are facially discriminatory, or in the alternative, that they are applied in a discriminatory fashion.  See Docket No. 169.

In their reply, the Defendants argue that the equal protection claim raised by the female inmates in their response to the Defendants' summary judgment motion is not a claim asserted in the original complaint.  The Defendants argue that the reference to Sections 12-47-38 and 12-44.1-06.3 in the complaint is insufficient to state a claim, and that if the female inmates wished to challenge the constitutionality of Sections12-47-38 and 12-44.1-06.3, they should have sought to amend the complaint.  In their surreply, the female inmates contend that the complaint cited the statutes challenged and alleged that those statutes applied only to female inmates.

The complaint states, in part:

> 31.     On the basis of sex, women inmates in the custody of the DOCR have been excluded from, denied the benefits of, and subjected to discrimination by being denied equal opportunity in housing, orientation programs, classification programs, educational programs, vocational programs, employment programs, recreational programs, substance abuse treatment programs, medical treatment, and security programs, and have been forced to live in an environment within the prison system that is hostile toward women because they are women.

See Docket No. 1.  Sections 12-47-38 and 12-44.1-06.3 of the North Dakota Century Code are referenced in the complaint as set forth below:

> 25.     In 2003, the North Dakota legislature disregarded the recommendations of their independent consultants and the DOCR, each of which had recommended the creation of a women's prison facility to be located in Jamestown, North Dakota, and enacted legislation calling for the transfer of female inmates to county jails.  On its face, the legislation applies only to women, and not men:  . . .

See Docket No. 1.  The following paragraphs of the complaint quote Sections 12-47-38  and 12-44.1-06.2.  See Docket No. 1, ¶ 25.

In an apparent attempt to clarify their claims, the female inmates' response defines their equal protection claim as follows:

> Plaintiffs do not challenge the defendants' policy of segregating male and female prisoners by gender.  Instead, plaintiffs challenge defendants' policy, based on statute, of removing female inmates from the custody of the Department of Corrections because of their gender, and sending them to the custody of the local county jails where they are unable to take advantage of the programs and services offered by the Department of Corrections.  That statute, on its face and as applied, violated plaintiffs' rights to equal protection under the United States and North Dakota Constitutions; U.S. Const. amend XIV, § 1; N.D. Const. art. I, § 21.

See Docket No. 169, p. 6.  The female inmates specifically state that they are "not challenging programming decisions made by the DOCR as to what programs should be offered at which facilities."  See Docket No. 169, p. 12.  However, a substantial portion of their response brief is devoted to arguing that, during the period the female inmates were housed at the James River Correctional Center and Missouri River Correctional Center, female inmates were subjected to disparate services  and programming.  See Docket No. 169, pp. 30-36.

The alternative theories offered by the female inmates are confusing.  Early in the litigation, the female inmates appeared to focus solely on the alleged differences in the programming opportunities and services for female and male inmates.  Faced with a summary judgment motion, the female inmates have shifted their focus solely to the decision, based on statute, to place female inmates at the Dakota Women's Correction and Rehabilitation Center.

In one section of their response, the female inmates assert that they are "not challenging programming decisions made by the DOCR."  See Docket No. 169, p. 12.  Yet, in the next paragraph the female inmates argue that "the opportunities for female DOCR inmates incarcerated at the DWCRC are fatally deficient as compared to the male inmates housed in DOCR facilities" and go on to list the following areas:  work release, orientation and housing, and substance abuse treatment.

20

See Docket No. 169, pp. 12-14.  The female inmates also devote a substantial portion of their responsive brief to setting forth alleged programming differences during the period the female inmates were housed at the James River Correctional Center and Missouri River Correctional Center.  See Docket No. 169, pp. 30-36.

Although the female inmates have gone to great lengths to argue that they are not comparing and challenging programs and services between the prison facilities, as unsuccessful plaintiffs in previous Eighth Circuit cases have done, the female inmates frequently engage in program comparisons while attempting to argue that they are not comparing programs.[7]  Counsel for the plaintiffs' invoke the term "process" in an attempt to avoid an outcome similar to well-settled Eighth Circuit case law.[8]  In other words, the plaintiffs allege that North Dakota has set up a "process," by statute, to remove female inmates from the programs and services available from the Department of Corrections and Rehabilitation system wide.  The Court finds that the female inmates' claims are difficult to comprehend at times and are often simply a matter of semantics rather than substantively different theories.  Although the female inmates attempt to bootstrap programming comparisons into their "process" argument, the Court expressly finds that by their own concessions, the female inmates have essentially abandoned any claims based on "programming comparisons" or "programming decisions."

---

[7]The Eighth Circuit Court of Appeals has held that female and male inmates in specific correctional facilities in Nebraska are not similarly situated for purposes of comparing prison programs and services.  See Klinger v. Dep't of Corr., 31 F.3d 727 (8th Cir. 1994).

[8]The Eighth Circuit noted in dicta that male and female prisoners are similarly situated for purposes of the process by which programming decisions are made.  See Klinger v. Dep't of Corr., 31 F.3d 727, 733 n.4 (8th Cir. 1994).

While it is clear that the complaint contains more detailed allegations comparing housing, facilities, classification systems, orientation programs, educational programs, vocational education programs, work opportunities, and substance abuse treatment opportunities provided to male and female inmates, the Court will liberally construe the complaint and find that the complaint sufficiently sets forth allegations of discrimination based on the North Dakota statutes referenced in the complaint.

The Court also finds that the female inmates have explicitly abandoned all other equal protection claims which could be construed from their complaint – i.e., claims based on the policy of segregating male and female inmates; claims based on a comparison of programs offered to male and female inmates at any time during the period in question; and claims based on allegedly inferior programs that are a result of discriminatory funding.  It is clear and undisputed from the record that the female inmates <u>are not</u> challenging programming decisions made by the Defendants.  Instead, they are only challenging the decision to exclude female inmates from the Department of Corrections and Rehabilitation system so such inmates had no opportunity to participate in <u>any</u> programs operated by the Department of Corrections and Rehabilitation. <u>See</u> Docket No. 169, p. 12. The only equal protection claim pending before the Court is whether the Defendants' decision, based on statute, to place female inmates at the Dakota Women's Correction and Rehabilitation Center violates the equal protection clauses of the federal or North Dakota constitutions.


II.     **STANDARD OF REVIEW**

It is well-established that summary judgment is appropriate when, viewed in a light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party

is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Graning v. Sherburne County, 172 F.3d 611, 614 (8th Cir. 1999).  A fact is "material" if it might affect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1376 (8th Cir. 1996). The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact.  If the moving party has met this burden, the non-moving party cannot simply rest on the mere denials or allegations in the pleadings.  Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial. Fed. R. Civ. P. 56(e).  A mere trace of evidence supporting the non-movant's position is insufficient.  Instead, the facts must generate evidence from which a jury could reasonably find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).


III.   **LEGAL DISCUSSION**

A.   **EQUAL PROTECTION**

The equal protection clause generally requires the government to treat similarly situated people alike.  See City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985).  The first step in an equal protection analysis is determining whether the plaintiffs have demonstrated that they were treated differently than others who were similarly situated simply because they belong to a particular protected class.  See Keevan v. Smith, 100 F.3d 644, 647-648 (8th Cir. 1996); Klinger

v. Dep't of Corr., 31 F. 3d 727, 731 (8th Cir. 1994).   Absent a threshold showing that they are similarly situated to those who allegedly received favorable treatment, the plaintiffs do not have a viable equal protection claim.  See Klinger v. Dep't of Corr., 31 F.3d 727, 731 (8th Cir. 1994); see also Barney v. Pulsipher, 143 F.3d 1299, 1313 (10th Cir. 1998) (Plaintiff's failure to establish that male inmates were similarly situated was basis a for granting summary judgment in favor of the defendant.); Oliver v. Scott, 276 F.3d 736, 746-47 (5th Cir. 2002).

The "similarly situated" inquiry focuses on whether the plaintiffs are similarly situated to another group for purposes of the challenged government action.  See Klinger v. Dep't of Corr., 31 F.3d 727, 731 (8th Cir. 1994) (citing More v. Farrier, 984 F.2d 269, 271 (8th Cir. 1993)).   Whether the female inmates are similarly situated to male inmates requires an inquiry focusing on the purposes of the challenged government action.  See Keevan v. Smith, 100 F.3d 644, 648  (8th Cir. 1996).

If a plaintiff cannot establish that they are similarly situated to those who allegedly received favorable treatment, the Court must still review the claim.  See Pargo v. Elliott, 894 F. Supp. 1243, 1262 (S.D. Iowa 1995);  Bills v. Dahm, 32 F.3d 333 (8th Cir. 1994).   The Eighth Circuit in Bills instructed as follows:

> Although [the plaintiff] may not be similarly situated to the inmates of the [female prison], he is entitled to a determination of whether the regulation complained of is arbitrary.  Where men and women are found not to be similarly situated, the court must still determine whether it would have been reasonable for a prison official to believe that the denial of overnight child visitation to [the plaintiff], in light of the program at the [female prison], was rationally related to a permissible state objective.  In Parham, the Court upheld a Georgia law that denied a biological father the right to recover in a wrongful death action for the death of an illegitimate child.  The decision of the Court affirmed the Georgia Supreme Court's determination that, although the mother and father were not similarly situated, the statute had to at least have a rational relationship to a legitimate state interest.

See Bills v. Dahm, 32 F.3d 333 (8th Cir. 1994) (relying on Parham v. Hughes, 441 U.S. 347 (1979)).

### 1.      INMATE PLACEMENT POLICY

Before reaching the merits of the female inmates' equal protection claim, the Court must first precisely define their claim.  As the female inmates have defined their claim, the issue before the Court is whether female inmates placed at the Dakota Women's Correction and Rehabilitation Center, pursuant to statute, are similarly situated to male inmates placed by the Department of Corrections and Rehabilitation.  To support their claim, the female inmates rely on two North Dakota statutes to establish a facially gender-based classification:  Section 12-47-38 of the North Dakota Century Code, which allows the Department of Corrections and Rehabilitation to place female inmates in county jails, and Section 12-44.1-06.3 (and its predecessor 12-44.1-06.2), which allows the Department of Corrections and Rehabilitation to place female inmates in "grade one correctional facilities" for more than one year.

### a.      SIMILARLY SITUATED ANALYSIS

As discussed above, the first step in an equal protection analysis is determining whether the plaintiffs have demonstrated that they were treated differently than others who were similarly situated simply because they belong to a particular protected class.  The female inmates make virtually no attempt to establish that they are similarly situated to any set of male inmates.  The complaint includes a brief reference to "similarly situated:"

> 22.      Female inmates are subjected to these unequal conditions despite being similarly situated to their male counterparts.  Female inmates have the same need for housing options, educational, vocational and job opportunities, and substance abuse treatment opportunities as male inmates.  In all material respects, men and women in the custody of the DOCR have comparable needs. . . .

25

See Docket No. 1, ¶ 22.  The female inmates' responsive pleadings to the motion for summary judgment do not in any manner attempt to establish that the female inmates are similarly situated. Rather, the female inmates expend considerable effort arguing that the Eighth Circuit decisions in Klinger v. Dep't of Corr., 31 F.3d 727 (8th Cir. 1994) and Keeven v. Smith, 100 F.3d 644 (8th Cir. 1996) do not apply to the current case.

The female inmates place significant emphasis on a footnote from the Klinger decision wherein the Eighth Circuit opined as follows:

> That the plaintiffs and NSP inmates are not similarly situated for purposes of prison programs and services does not mean that female inmates are foreclosed from bringing equal protection claims challenging the state's treatment of them.  As it is set forth in the complaint, the plaintiffs' claim here required an inappropriate comparison of programs at NSP and NCW in twelve different areas.  Some comparisons of the Department's respective treatment of male and female inmates, however, are appropriate.  For instance, male and female inmates are similarly situated for purposes of the *process* by which the Department makes programming decisions.  That is, instead of alleging differences in programs between prisons, a proper equal protection claim may allege differences in the process by which program decisions were made at the prison.
>
> For instance, if the Department selected vocational programs at men's prisons based on inmate surveys, but unilaterally selected such programs at NCW without consulting the inmates at all, NCW inmates would be able to make the requisite threshold showing that they were treated differently than others similarly situated. Thus, male and female inmates *are* similarly situated at the beginning of the decisionmaking process, where infinite intervening variables have not yet excessively tainted the comparison between prisons nor are officials' substantive administrative decisions yet at issue.  We need not elaborate on the details of pleading and proving such a claim here.  Suffice it to say that the plaintiffs have not pleaded such a claim.

See Klinger v. Dep't of Corr., 31 F. 3d 727, 733 n.4 (8th Cir. 1994).  The female inmates appear to interpret the footnote in Klinger to mean that if female inmates allege a discriminatory process by the Department of Corrections and Rehabilitations, the female inmates are relieved of the requirement to establish that they are similarly situated to the male inmates allegedly receiving

favorable treatment.  The female inmates also contend that <u>Klinger</u> and <u>Keeven</u> do not apply to their claims because "North Dakota's inmate placement policy . . . is facially discriminatory."  <u>See</u> Docket No. 169, p. 10.

The Court is reluctant to rely on a footnote setting forth a hypothetical case for the proposition that a plaintiff alleging an equal protection claim based on the "process by which program decisions" are made has automatically cleared the "similarly situated" hurdle in a case alleging discrimination regarding placement, not programming decisions.  Nor has the Court found any support for the female inmates' contention that in cases alleging a facially discriminatory policy, a plaintiff need not establish that she is "similarly situated" to those who allegedly received favorable treatment.

The Court recognizes that the female inmates' claims, as defined in their response brief, are different than those alleged in either <u>Klinger</u> or <u>Keeven</u>.  It is undisputed that in both <u>Klinger</u> and <u>Keeven</u>, the plaintiffs were alleging discrimination in the programs offered to male and female inmates confined in facilities operated by the states of Missouri and Nebraska, respectively.  <u>See Klinger v. Dep't of Corr.</u>, 31 F.3d 727 (8th Cir. 1994); <u>Keeven v. Smith</u>, 100 F.3d 644 (8th Cir. 1996).  Here, the female inmates are challenging the decision to exclude female inmates from placement in a prison facility operated by the Department of Corrections and Rehabilitation system so that they have no opportunity to participate in any programs operated by the Department of Corrections and Rehabilitation.  The female inmates have arguably failed to establish their burden of showing that they are similarly situated to those who allegedly received favorable treatment.  Nevertheless, the Court finds that it need not reach such a conclusion because, even if the female inmates are considered to be similarly situated to male inmates placed in prison facilities operated

by the Department of Corrections and Rehabilitaiton, the female inmates have failed to establish that the Defendants discriminated against them because of their sex.

### b.    DISCRIMINATORY PURPOSE

If the plaintiffs establish that they are similarly situated to those allegedly receiving favorable treatment, they must next show that the state discriminated against them because of their sex.  See Klinger v. Dep't of Corr., 31 F.3d 727, 733 (8th Cir. 1994) (citing Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 274 (1979)).  "Discriminatory purpose implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group."  See Keevan v. Smith, 100 F.3d 644, 651 (8th Cir. 1996)(citing Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979)) (internal quotations omitted).

The female inmates contend that because Sections 12-47-38 and 12-44.1-06.3 of the North Dakota Century Code apply only to female inmates, that the Defendants have discriminated against them because of their sex.  Specifically, the female inmates argue that the "[D]efendants' policy, based on statute, of removing female inmates from the custody of the Department of Correction because of their gender" violates the equal protection clause.  The female inmates argue that the North Dakota statutory scheme results in female inmates, and only female inmates, being housed in county jails for a term longer than one year and there is no requirement to provide employment opportunities to the female inmates housed in county jails.  The Defendants respond by asserting that the female inmates do not have standing to challenge the North Dakota statutes in question because female inmates are not, nor have they even been, housed in a county jail pursuant to these statutes.

28

It is well-established that a party invoking federal jurisdiction must establish that she has met the requirements of both constitutional and prudential standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). The burden to show standing is not a mere pleading requirement, "but rather an indispensable part of the plaintiff's case." Id. Constitutional standing has three requirements. Lujan, 504 U.S. 555, 560-61. First, a plaintiff must demonstrate that she has suffered an injury in fact which is actual, concrete, and particularized. Second, the plaintiff must show a causal connection between the conduct complained of and the injury. Third, the plaintiff must establish that the injury will be redressed by a favorable decision. Id.

"Under Article III of the Constitution, federal courts 'may adjudicate only actual, ongoing cases or controversies.'" McCarthy v. Ozark School Dist., 359 F.3d 1029 (8th Cir. 2004) (quoting National Right to Life Political Action Comm. v. Connor, 323 F.3d 684, 689 (8th Cir. 2003). Various doctrines, including the doctrine of mootness, provide the tools used to determine whether a plaintiff presents a justiciable case or controversy. McCarthy v. Ozark School Dist., 359 F.3d 1029 (8th Cir. 2004). The Eighth Circuit recently stated:

> The Supreme Court has repeatedly described the mootness doctrine as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citations omitted). Thus, "[w]e do not have jurisdiction over cases in which 'due to the passage of time or a change in circumstances, the issues presented . . . will no longer be 'live' or the parties will no longer have a legally cognizable interest in the outcome of the litigation.'" Van Bergen v. State of Minn., 59 F.3d 1541, 1546 (8th Cir.1995) (quoting Arkansas AFL-CIO v. FCC, 11 F.3d 1430, 1435 (8th Cir.1993) (en banc)).

National Right to Life Political Action Comm., 323 F.3d 684, 691 (8th Cir. 2003).

The Defendants contend that the female inmates are unable to set forth an injury in fact which is causally connected to the state statutes in question. As the Defendants contend, it appears

that the female inmates fail to appreciate the difference between the Southwest Multi-County Correction Center and the Dakota Women's Correction and Rehabilitation Center. The Southwest Multi-County Correction Center is a regional corrections center which operates two other facilities: (1) the Dakota Horizon Youth Center and (2) the Dakota Women's Correction and Rehabilitation Center.

The North Dakota Department of Corrections and Rehabilitation contracts with the Southwest Multi-County Correctional Center to house female inmates at the Dakota Women's Correction and Rehabilitation Center. The Dakota Women's Correction and Rehabilitation Center has never operated as either a county jail or as a regional corrections center. See Affidavit of Leann Bertsch, ¶ 3. It has not been inspected by the Department of Corrections and Rehabilitation and has never been assigned a grade. See Affidavit of Leann Bertsch, ¶ 3. As such, it does not meet the definition of either a county jail or a regional corrections center as set forth in Section 12-44.1-01. It has also never housed pretrial detainees or inmates awaiting sentencing.

It is undisputed that the Dakota Women's Correction and Rehabilitation Center houses female inmates pursuant to a contract with the Department of Corrections and Rehabilitation. The Dakota Women's Correction and Rehabilitation Center is operated by the Southwest Multi-County Correction Center's board of directors under the authority of a joint powers agreement by a consortium of counties. The Dakota Women's Correction and Rehabilitation Center was remodeled specifically for use as a contract facility to house female inmates. The Court finds, as a matter of law, that the Dakota Women's Correction and Rehabilitation Center in New England, North Dakota, is not, and has never been, a county jail or a regional correctional center as contemplated in the challenged statutes. The Dakota Women's Correction and Rehabilitation Center is a separate and

distinct facility.  Accordingly, the Court finds that the female inmates lack standing to challenge the constitutionality of statutes which have never applied to them.

The Court notes that the female inmates' challenge to Section 12-44.1-06.3 would also fail on the basis of mootness.  It is undisputed that Sections 12-44.1-06.2 was enacted in  2003 and expired in 2005.  Section 12-44.1-06.3 was enacted in 2005, contained the identical language of Section 12-44.1-06.2, and expired on June 30, 2007.  Section 12-44.1-06(3) was then amended in 2007 to incorporate a gender-neutral version of these earlier statutes.  The principle of mootness of a statute that has been repealed applies whether the statute was repealed prior to the complaint or during the pendency of the litigation.  Epp v. Kerrey, 964 F.2d 754, 755-56 (8th Cir. 1992).  The Court finds that the expiration of Sections 12-44.1-06.2 and 12-44.1-06.3 renders the female inmates' claims moot based on these statutes.  As a result, the Court finds that the equal protection claims must fail as a matter of law.

In their response, the female inmates defined their equal protection claims based on North Dakota's statutory scheme regarding county jails and regional corrections centers – state statutes that clearly do not apply to female inmates currently placed at the Dakota Women's Correction and Rehabilitation Center.  Without the reliance on the statutes, the female inmates' claims are nothing more than a challenge to the segregation of male and female inmates – a challenge they explicitly have not made in this lawsuit.  See Docket No. 169, p.6 ("Plaintiffs do not challenge the defendants' policy of segregating male and female prisoners by gender.").

The Court expressly finds that the female inmates have failed to establish a prima facie case that their equal protection rights, under either the federal or North Dakota constitutions, have been violated.  The Court finds, as a matter of law, that Sections 12-47-38, 12-44.1-06.3, 12-44.1-06.2,

and 12-44.1-06(3) of the North Dakota Century Code are not discriminatory as to the female inmates because these state statutes have never governed the placement of the female inmates at the Dakota Women's Correction and Rehabilitation Center.

Even if the Court were to determine that the statutes in question applied to the female inmates, they are still unable to show that their placement at Dakota Women's Correction and Rehabilitation Center,  and their alleged removal from the Department of Corrections and Rehabilitation system, is a result of the challenged statutes.   Prior to the enactment of the statutes in question, the director of the Department of Corrections and Rehabilitation clearly had the power to contract, and has contracted in the past, with other entities to provide correctional services to inmates in the legal and physical custody of the Department of Corrections and Rehabilitation.   See N.D.C.C. § 54-23.3-04 (11) (enacted in 1991).   Because the Department of Corrections and Rehabilitation was empowered to contract with other entities for the placement of male inmates and female inmates prior to the enactment of the statutes in question, the female inmates are unable to establish that their placement at the Dakota Women's Correction and Rehabilitation Center was based on a discriminatory statutory scheme.  If the female inmates are only challenging the statutory "process" of removing female inmates from the Department of Corrections and Rehabilitation while not similarly providing for the removal of male inmates, the challenge must fail because the "process" is not discriminatory – the same "process" applies to female and male inmates.

The Court finds that there are no genuine issues of material fact that preclude the entry of summary judgment as to the equal protection claims.

B.    **TITLE IX**

Title IX states, in relevant part: "No person in the United States shall, on the basis of sex,

be excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).

Title IX's definition of "program or activity," provides as follows, in part:

> For the purposes of this chapter, the term "program or activity" and "program" mean
> all of the operations of -
> > (1)    (A)    a department, agency, special purpose district, or other
> > instrumentality of a State or of a local government; or
> > > (B)    the entity of such State or local government that distributes
> > such assistance and each such department or agency (and
> > each other State or local government entity) to which the
> > assistance is extended in the case of assistance to a State or
> > local government;
>  . . . any part of which is extended Federal financial assistance, except that [stating
> an exception that does not apply in the present case.]

20 U.S.C. § 1687.

It is clear that the "similarly situated" analysis applied in equal protection cases does not

apply to Title IX cases.  See Klinger v. Dep't of Corr., 107 F.3d 609, 614 (8th Cir. 1997).  "Congress

has indicated, by its enactment of § 1681(a) and by the specific language employed therein, that

female and male participants within a federally-funded education program or activity are presumed

similarly situated for purposes of being entitled to equal educational opportunities within that

program or activity."  See Klinger v. Dep't of Corr., 107 F.3d 609, 614 (8th Cir. 1997).

The Eighth Circuit has held that a state's entire prison system is considered a "program or

activity" within the statutory definition.  See Klinger v. Dep't of Corr., 107 F.3d 609, 615 (8th Cir.

1997).

It is beyond controversy that male and female prisoners may lawfully be
segregated into separate institutions within a prison system.  Gender-based prisoner

33

segregation and segregation based upon prisoners' security levels are common and necessary practices. When considering single-sex prisons, the only logical and workable application of the definition of "program or activity" under Title IX requires comparison of <u>educational opportunities</u> for female and male prisoners within the entire system of institutions operated by a state's federally-funded correctional department or agency, taking into account the objective differences between the male and female prison populations such as penological and security considerations as are necessary to accommodate in this unique context. <u>See</u> <u>Jeldness v. Pearce</u>, 30 F.3d at 1228-29 (taking into consideration differences between circumstances of female and male prison populations in Oregon prison system and holding that "[a]lthough the programs need not be identical in number or content, women must have reasonable <u>opportunities for similar studies</u> and must have an equal opportunity to participate in programs of comparable quality"). This is not to say that no comparison can be made, consistent with Title IX, where there are significant differences between male and female prison population within a state's correctional system, such as unequal population sizes and lengths of stay. Rather, equal opportunities must be afforded consistent with those differences. <u>See</u> <u>id.</u>

<u>See</u> <u>Klinger v. Dep't of Corr.</u>, 107 F.3d 609, 616 (8th Cir. 1997) (emphasis added).

The Defendants contend that the prison industry programs offered by the Dakota Women's Correction and Rehabilitation Center is not a program or activity for purposes of Title IX, or in the alternative, that female inmates at Dakota Women's Correction and Rehabilitation Center receive comparable educational  programs to male inmates under the jurisdiction of the Department of Corrections and Rehabilitation. The female inmates argue that the Defendants have discriminated against them by providing inferior prison industries programs and vocational training. <u>See</u> Docket No. 169, pp. 26-30. It is important to note that the female inmates are not challenging the traditional educational programs (adult basic education and GED) offered to female prisoners. Although the Defendants argue that the monies paid to the Dakota Women's Correction and Rehabilitation Center pursuant to the contract do not include federal funds, it is undisputed that both the Department of Corrections and Rehabilitation and the Dakota Women's Correction and Rehabilitation Center receive federal funds.

1.     **PRISON INDUSTRIES**

The Defendants contend that prison industry programs are not considered "education programs or activities" within the purview of Title IX.  The Defendants state that prison industry programs provide inmates the opportunity to earn sufficient wages to make purchases from the inmate commissary, pay restitution, support family, and accumulate funds for their release.   The Defendants rely on a 1996 case from the District of Columbia Circuit which states as follows:

> But even though we do not address the scope of Title IX in the prison context, we admit to grave problems with the proposition that work details, prison industries, recreation, and religious services and counseling have anything in common with the equality of *educational* opportunities with which Title IX is concerned.

See Women Prisoners of the Dist. of Columbia Dep't of Corr. v. Dist. of Columbia, 93 F.3d 910, 927 (1996).

The female inmates argue that prison industry programs are educational programming within the purview of Title IX.  The female inmates cite to a section of the Federal Register from 2000 to support their theory.  The female inmates argue that the prison industry programs at Dakota Women's Correction and Rehabilitation Center are "significant components of an inmate's education."  See Docket No. 169.

None of the parties have identified, nor has the Court found, any case law on whether prison industry programs are considered "education programs or activities" covered by Title IX.  The Court acknowledges that most employment carries with it the opportunity to gain experience and obtain a certain skill set that an individual may not have had before engaging in the employment.  However, the Court finds that  whatever "on-the-job-training" an inmate may receive while working in the prison industry programs offered at the Dakota Women's Correction and Rehabilitation Center and

the Department of Corrections and Rehabilitation, such skills are not synonymous with "education" as contemplated by Title IX.  As a result, the Court expressly finds that the prison industry programs offered at the Dakota Women's Correction and Rehabilitation Center are not "education programs or activities" as defined by Title IX, and that the female inmates have failed to establish a prima facie case of discrimination under Title IX as to the prison industry program.

### 2.   VOCATIONAL TRAINING

It is undisputed that vocational training offered in a correctional setting is subject to Title IX. See 65 Fed. Reg. 52859; Klinger v. Dep't of Corr., 107 F.3d 609, 616 (8th Cir. 1997).  Title IX, as applied in a corrections context, requires that "equal opportunities must be afforded consistent with" "the objective differences between the male and female prison populations such as penological and security considerations."  See Klinger v. Dep't of Corr., 107 F.3d 609, 616 (8th Cir. 1997).

As previously discussed, numerous educational classes, which the Court will construe to be considered "vocational training," have been offered to female inmates and male inmates during the time period in question.  Male inmates housed at the North Dakota State Penitentiary have had access to computer classes, a non-credit accounting course, work-force training classes, independent college study correspondence classes, an on-site course for college credit, a restaurant management class, and a heating and air conditioning program.  See Affidavit of Timothy Schuetzle, ¶¶ 22-22, 26 (Docket No. 90); Deposition of Dan Wrolstad, pp. 48-49, 56 (Docket No. 177, Disc 1); Deposition of Timothy Schuetzle, p. 245 (Docket No. 177, Disc 1).  Male inmates housed at the Missouri River Correctional Center have had access to computer classes, college classes at local colleges at the inmates' own expense, work-force training classes, an auto technical program,

welding courses, and carpentry courses.  <u>See</u> Affidavit of Timothy Schuetzle, ¶¶ 20-24 (Docket No. 90); Deposition of Timothy Schuetzle, p. 245 (Docket No. 177, Disc 1).  Male inmates housed at the James River Correctional Center have had access to computer classes, correspondence classes that can be taken at an inmate's expense, work-force training classes, and a food service program that provided hands-on and classroom experience in food service.  <u>See</u> Affidavit of Timothy Schuetzle, ¶¶ 20-22 (Docket No. 90); Deposition of Donald Redmann, pp. 187-190 (Docket No. 177, Disc 1).  The female inmates housed at the Dakota Women's Correction and Rehabilitation Center have had access to computer classes, work-force training classes, welding program, basic parenting classes, social skills and healthy lifestyles classes, and college classes through the ITV system with Dickinson State University.  <u>See</u> Affidavit of Timothy Schuetzle, ¶¶ 20, 21, 22, 23, 25, 27 (Docket No. 90); Deposition of Heather Luchi, pp. 109-112, 115, 119-120, 124-125, 132 (Docket No. 117, Disc 1); Deposition of Colby Braun, p. 188 (Docket No. 177, Disc 1).

The Defendants contend that female inmates at the Dakota Women's Correction and Rehabilitation Center have a reasonable opportunity for similar studies and have an equal opportunity to participate in programs of comparable quality.  The Defendants also contend that the availability of vocational training depends on where an inmate is placed and is not premised on the gender of the inmate.

After a thorough review of the record, the Court finds that all inmates have access to computer classes, work force training classes, and college classes.  The Court also finds that the availability and access to the restaurant management, heating and air conditioning, auto technician, welding, carpentry, and food service programs is based on the location of inmates, not on their gender.  <u>See</u> <u>Jeldness v. Pearce</u>, 30 F.3d 1220, 1229 (9th Cir 1994) ("If an education program takes

place in the prison, exclusion of women from a particular class solely because women do not reside at the prison offering that class is not improperly segregating separately on the basis of sex, but it is rather an activity separate[d] on the basis of location."). The Court will not presume that differences in treatment are on the "basis of sex." See Klinger v. Dep't of Corr., 887 F. Supp. 1281, 1286 (D. Neb. 1995).

The Court finds that the female inmates have failed to establish a prima facie case of discrimination under Title IX as to the vocational training offered in prison. The Court further finds that there are no genuine issues of material fact which would preclude the entry of summary judgment as to the Title IX claims.


## IV.   CONCLUSION

For the reasons set forth above the Court **GRANTS** the Defendants' Motions for Summary Judgment. (Docket No. 89 and 135). The Court **DENIES** as moot the "Plaintiffs' Rule 56(f) Request in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment" (Docket No. 173), and the State Defendants' "Motion to Strike Statement of Genuine Issues of Material Fact for Trial and Declarations" (Docket No. 182). Finally, the Court finds it unnecessary to rule on the Report and Recommendation issued by Chief Magistrate Judge Karen K. Klein, on January 4, 2007 (Docket No. 144). The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

Dated this 19th day of November, 2007.

/s/  Daniel L. Hovland
Daniel L. Hovland, Chief Judge
United States District Court

38